Good morning, Your Honors. My name is Scott Grenzick, here for the Plaintiff Appellants in this matter. I'd like to reserve three minutes for rebuttal. Plaintiffs allege that in the early 2000s, defendants experienced a sharp decline in retail prices for guitars and guitars. Let me interrupt you, probably not too politely. I'm trying to get an impression of which type of a conspiracy you claim to be alleging, and I'll give you a choice. Number one, are you alleging a vertical conspiracy between Guitar Center and a manufacturing defendant, which is a violation of Section 1? Or, next option, are you alleging a hub-and-spoke conspiracy without a rim involving Guitar Center as the hub and each of the five manufacturing defendants as a spoke, but without a rim? Or are you alleging a hub-and-spoke conspiracy between Guitar Center as the hub and each of the defendants as a spoke with an agreement among the spokes to wit a rim? Which of those three are you alleging? The third option, Your Honor. The third option, and the third option only? Yes, Your Honor. All right, thank you. Now, what are the facts that are alleged in this complaint from which we could plausibly infer that there was an agreement among the spokes, that is, the manufacturers, rather than what Twomley characterizes as conscious parallelism in an interdependent market? So, there are six predominant types of facts that plaintiffs alleged in their complaint. Are you talking about the plus factors? Yes, Your Honor. All right, let's go into those, because I think it is common ground that the complaint does not allege that any of the manufacturers, the spokes, as we call them, that any of the spokes manufacturers sat down at the Parkway Grill and, on a certain date, agreed to enter into minimum advertising price contracts if the others would. There's no such factual allegation, correct? Not in that sense, Your Honor. Right. So, now what we have to do is to take a look at each of the six. You say six, and perhaps they're six, perhaps they're five, but let's take all six. And I want you to go through them and tell me what the factual allegation as to each one of those plus factors is, where it is in the complaint, right, and why we should be able to infer an agreement as to the third type, the rimmed spoke and hub conspiracy. Certainly, I'll go through them one by one, having answered questions about each along the way. The first that was alleged is a motive. Can I ask you one question? Yes. Did you diagram this case? I'm sorry, did we? Did you diagram it? In a visual sense, no, Your Honor. Huh? No, Your Honor. I mean, we didn't produce any diagrams at the district court level. I mean, did you do it while you're preparing for this oral argument? Certainly, yes. I mean, in the sense of going through and looking at the facts alleged to the complaint. Well, it's a good idea to diagram some of these cases. Right. We went through and did basically what the diagram would show, which would show the connections among the various spokes. And so to the extent that that's what the diagram would have shown, we certainly went through and did that for each of the factual allegations in the complaint, as Justice Bey is alluding to, or Judge Bey is alluding to. Back to Judge Bey's question. The first was a motive. And we understand and recognize that certainly motive alone isn't enough to get a conspiracy across the line, a conspiracy allegation into plausibility. But here what the complaint alleges, and this largely can be found at pages approximately 59 through 61 of the record, is that. . . Now, hold on, hold on. Are you talking about the supplemental excerpts of record or the excerpts of record? What's your reference? The original excerpts of record. All right. If I'm referring to the supplements, I'll clarify that as a supplemental excerpt. And the first plus factor is what again? Motive. The defendant shared a common motive to conspire? Correct. Well, but that's always true of an interdependent market, isn't it? I mean, the common motive of all manufacturers of guitars is to get the best price possible for each of the guitars, correct? That's correct, Your Honor. And the best price is the highest price, right? Correct. So then they have a common motive to get an effect. But that is always true of an interdependent market, and it's always so of conscious parallelism according to Twombly. So tell me how that shoves the allegations into the plausible agreement finding. Well, plaintiffs have alleged that if you looked at motive simply in isolation, that that would push the complaint across the line that it needs to. But as sort of numerous courts have indicated, in these types of allegations or really in any conspiracy case, you should look at the various allegations together as a whole instead of compartmentalizing them on sort of an individual basis. So, for example, let's combine motive with the second plus factor. All right. So the first factor is motive, and by itself it doesn't shove it across the line into plausibility, but it's combined with others, right? That's correct. All right. Now, in this cocktail of plus factors, which of the factors would you ally with combined motive? Well, I'd say that you should look at them all together, but, for example, let's take the second plus factor. Let's get the list of the factors, and then maybe we can take them one by one. Certainly. So the six identified would be, first, motive. Second, actions taken against each manufacturer's independent self-interest. Why don't you try speaking a little slower? Certainly. Third would be the similarity in various MAP agreements. Fourth would be the FTC's investigation. Fifth would be the allegations regarding NAM meetings, events that occurred at those trade association meetings, and statements made. And lastly would be the pricing information that plaintiffs provided, showing a steep decrease in pricing, and then at the start of the alleged conspiracy, suddenly price stabilization and increasing of retail prices. Give me five again. Five would be the allegations regarding the NAM trade association meetings and the various comments and statements made there. Now, Judge Burns had an opportunity to examine these allegations twice. First on the motion to dismiss, which was granted with leave to amend. Not only with leave to amend, but leave to conduct discovery. And I believe you took the deposition of seven of the executives involved in this case. It isn't every day that a defendant gets discovery before a motion to dismiss. And you took their depositions. Now, in any of the depositions, did the deponents give any testimony as to sitting down in a room with another deponent or another officer from another company and saying, I'll go along with Guitar Center's request for a minimum advertising price policy, if you will? No, Your Honor. Or anything like that? I mean, was there any, even a tacit agreement, evidence, such as they were all sitting in a room and somebody came up and said, does anybody have any objection to this kind of a policy? And everybody stayed mute? No, Your Honor. Unsurprisingly, none of the deponents. So let's get back to Twomley's facts. Twomley tells us in a telephone context that the companies, the regional companies' intervention in other areas, or really in Twomley, the lack of intervention in other areas, was explainable in an interdependent market by conscious parallelism. They didn't want to do it because it wasn't in their interest to go in and do it. Somebody else could say that sounds like a conspiracy, and if you do say it sounds like a conspiracy, Twomley tells you, okay, allege the facts where these guys conspired. So tell me, where is there any evidence of any contract, combination, or agreement among the defendants that form the rim to the spoke conspiracy? Well, I'd like to get back to Twomley for a moment because I think that helps provide some context for the answer. What Twomley held isn't that plaintiffs are required to plead these types of backroom one-on-one meetings or agreements. Instead, what Twomley recognized is that plaintiffs have to plead factual content that suggests that a conspiracy was made. And numerous courts, both inside of the motion to dismiss context and in the summary judgment context, including the Supreme Court, have noted that direct evidence is rarely available even after an evidentiary record is produced, for example, at summary judgment. Let's take your plus factor four. As I understand it, the mere fact that there was an FTC investigation suggests what? Well, Your Honor, we would say that the allegation is more nuanced than that. It's not the mere existence of the FTC investigation itself, but it's rather the allegations the FTC made after they've done and concluded their own investigation. But don't we look to the fact that there was eventually a settlement that was entered and that the only outcome of the investigation was a consent decree that said, I will remind everybody at our NAM meetings that you shouldn't be saying things that could violate the antitrust laws. I'm grossly oversimplifying. But there was no admission of liability, no payment of money, no acknowledgment that there was any fire to the smoke here. So what do I do with that fact? Well, another thing to recognize about the ultimate conclusion of the FTC investigation, and this is at paragraph 144 of Plaintiff's complaint, which is page 76, is the FTC specifically said that its decisions and conclusions in that investigation were not to be construed that there was a finding of no wrongdoing. So it certainly left that open-ended, and it didn't reach the conclusion which you were generally alluding to, that there was no wrongdoing. I mean, the problem I have with your argument, it would be wonderful if we could resolve criminal cases because the government investigated someone. But we generally require more than the mere fact that the police conducted an investigation to conclude that somebody might be responsible for a crime. And here, we don't have a complaint that was filed by the FTC or the Justice Department. We have the fact that a government agency with responsibility for antitrust and trade enforcement conducted an investigation. But at the end of the day, it was sort of a powder puff result. We would disagree, Your Honor. There was a complaint that was filed in conjunction with the consent decree. There was an analysis of agreement that was conducted. But there was no admission of liability. Certainly, but the reason the FTC investigation is relevant and adds plausibility to plaintiff's claims is because, and this is predominantly on page 73 of the record, is after conducting an investigation, after reviewing documents, they alleged in their complaint that NAM had facilitated meetings at which its various members discussed MAP policies, MAP pricing, MAP enforcement, and urged uniformity among MAP policies within the industry. What factual evidence do you allege in your complaint that would let the court reach the conclusion that there was a plausible existence of an antitrust conspiracy? Well, for example, let's combine what we're talking about, the FTC agreement, with the NAM allegations. But what you're doing, I think, is you're asking us to draw a conclusion from an allegation. And as I read Iqbal and Twombly, that's exactly what we're not supposed to do. So what facts do you have? What evidence are you alleging in your complaint? The facts would be, for example, looking at the allegations regarding the NAM Trade Association meetings separate from the allegations involving the FTC. Plaintiffs outlined a number of specific meetings at NAM Trade Association meetings in which MAP policies, their enforcement, and uniformity of conduct was openly advocated. Plaintiffs also identified specific instances in which a number of the defendants participated in these panels and also advocated the use of MAP policies. Let me ask you something. Let's suppose that NAM said to the five manufacturers, it is in your interest, gentlemen, to conspire to violate the antitrust laws of the United States. Thereby, you can raise prices and make a lot more money. And furthermore, the way you can conspire is to adopt MAPs, minimum advertised policy. Now, the five manufacturers go back to their offices and they adopt MAPs. Is that evidence that they agreed to do so? I see my time is up, so I'll conclude briefly. There are numerous cases, and that's similar to actually the fact pattern in interstate, save for explicitly stating that it would violate the antitrust laws, where one hub informed the various spokes of a particular type of action with the understanding that all of the various spokes would engage in that type of conduct. And that can be an antitrust violation. Well, if NAM hopes that their members will follow the MAP policy, does that establish an agreement between the members? It can, Your Honor. How can it? Do we have a case that says that? Do we have any case that shows a rimmed conspiracy based on trade association recommendations? Not trade association recommendations specifically, but here the trade association fills a similar role, for example, to the hub in interstate or the hub in the Toys R Us case. It doesn't necessarily matter what type of hub you're talking about. The issue is whether the hub was helpful and assisted the various spokes here, the manufacturers, in coming to a concerted course of action. You told me at the very beginning of our conversation that the one that you were not alleging a vertical conspiracy between the hub and a spoke, right? Not solely, but there are vertical arrangements between the hub and the spoke. But that's not this case. That's not the base case. Thank you. I didn't mean to take up any more of your time. Let me ask you this. Your position is that there are four factors that support an illegal agreement. Will there be six? Four. Four basic ones. Sure. Some of them overlap. Yeah. One is, the first one, is that NAM sponsored events, discussed and promoted specific minimum advertising pricing. Those are the maps. And that the fact that they all, the argument is they all fell in line and adhere to that approach, that takes care of one of them. Correct. Is that right? That's essentially the new allocation. Yeah, essentially, yeah. All right. And then the FTC investigation and findings that NAM sponsored anti-competitive communications between retailers and manufacturers, you conclude that that was one of the FTC's findings. One of the allegations they made after. But did the FTC, they made that allegation? Correct. Where do I see that in your complaint? The allegation regarding sponsoring meetings. Well, I'm looking at the language you referred me to, paragraph 144, at lines 11 through 13, and the FTC's letters to the other subjects of the investigation, these would be the people that they investigated but didn't enter into the consent decree, which says this action, the closure, is not to be construed as a determined that a violation may not have occurred. The commission reserves the right to take such action as the public interest may require. All I read that to say is we're not saying there wasn't one here, and we might do something in the future if we get some evidence, but we don't have any evidence, so we're resolving this case against you. Respectfully, I don't think you can necessarily infer that the FTC is saying we don't have any evidence, and I would refer your honors to you. Well, if they did, then they would have pursued the other subjects, would they not? We don't know. I just want to finish with them. Okay? Go ahead. Because I don't have the same approach to this as you folks do. Okay. Now, all you have to do to satisfy the requirements that would let you go forward vis-à-vis the Trombley decision is that there's some plausible evidence that would lead a reasonable person to believe that there's something there. Huh? Yes. You haven't had discovery. That's correct. Not discovery that we would say was aligned or sufficient in this case. And we do have some information here that there was a downtrend in sales because we had this big economic collapse, and that the five major manufacturers, there's evidence that they maintained and adhered to that map formula, and so that is certainly some plausible evidence that there was a meeting of the minds of some sort. In other words, even though there was a falling demand because they maintained that price structure, they made money. Huh? Correct. Yeah. All right. And then those five manufacturers also adopted the minimum advertised pricing formulas. And was it in their self-interest to adopt those formulas? We would allege that, no, it wasn't in their independent economic self-interest, and that comes from the mere fact that in a competitive market, a manufacturer's interest is having its product priced competitively so that it can gain sales volume. Why don't you talk a little slower? Certainly. I apologize. Yeah. In a competitive market— See, that's the trouble with the younger generation. Everybody talks very fast, you know. You listen to a pound of radio and these comments of boom, boom, boom, boom, boom. I'll try and slow it down. Abraham Lincoln didn't talk fast. Well, if I can get anywhere close to that, I'll try. Yeah, try. That's something to aspire to. Yeah. In a competitive market, a retail manufacturer's independent self-interest is to gain profits, is to make money. And in a competitive marketplace, the best way to do that is to let your prices be flexible, to allow them to be lower than your competitors so you can gain sales volume. Let's say, for example, in this case— That's what Adam Smith told us. And quite a few courts have told us. Of course, that doesn't happen. Well, quite a few courts have also come to the conclusion that in a competitive marketplace, that's generally what you see is price competition. Yeah. And here, instead, what each manufacturer's map policy does is it prevents price competition at the retail level. So this is, for example, why it's not in their independent interest. Let's say only one of the manufacturers had told its retailers that they were not allowed to make their products competitive on price. Let's say Fender, for example, implemented a map policy and told its retailers, you can't discount the advertised price. That would put them at a competitive disadvantage. Well, that wasn't— Right. Well, that's what the map policies do, essentially, is they tell a retailer, you're not allowed to advertise a product below a particular price. Yeah, but when someone comes into the store, then they can negotiate. If they were savvy enough to do that, yes. What? If they were savvy enough to do that, yes, Your Honor. But restraining prices or restraining advertised prices at the retail level is still a way of restraining competition. Oh, yeah, yeah. And so it's only with an understanding that the other manufacturers would be implementing similar minimum advertised pricing policies that those policies are in any individual manufacturer's self-interest. And so that is an important plus factor that lends plausibility to plaintiff's claims. I'm happy to answer any other questions. All we really need is a suggestion that an agreement has been made or there's been a meeting of the minds so that that results in some restraint of trade. We would agree wholeheartedly. You don't need a lot. You don't need a lot to get— What I understand Trombley wants is they just don't want a situation where someone looks around and thinks, well, I think they're violating the antitrust laws, and I'm going to bring a lawsuit, and I'm going to get all this discovery and find out what's going on. You can't do that because we're protecting these big companies. We don't want them to spend a lot of money wastefully. Right? That's what we're doing. So to get over that hump, and it shouldn't be a great hump, you have to come up with some plausible evidence that would indicate that there's a suggestion or an inference of anti-competitive conduct. That's your position. That's correct. All right. And then importantly— Counsel, may I ask you one question to follow up with what Judge Preggison was asking you? If I read your complaint correctly, and correct me if I'm wrong, it seemed to me that the thrust of these minimum advertising policies came not from your allegations, came not from the agreement of the spokes, but from the coercion of the hub to wit retail center. It was retail center which leaned on each of these manufacturers and said, you will adopt minimum advertising policies, right? That's what you alleged. Correct. There's allegations. If I may briefly sort of address, I think, what the implication of that allegation is and how that—another factor that sort of plays in with that. But that's a factor that shows a vertical conspiracy. Not even a conspiracy because it is coercive from the point of view of retail center. It is not much of an agreement there. They're holding a gun to the head of the manufacturer. But even were it a consented gun to the head situation, it would be between the hub and the spoke, not between the spokes and the spokes. May I address? Well, you know. Okay. Lots of diagrams you can draw. Correct. And there certainly is allegations in the complaint regarding Guitar Center's influence in the market. But that was also true in Interstate. That was also true in Toys R Us. That was true in the Baby H case that we cited. In all those cases, you dealt with a dominant retailer, and the court still found horizontal antitrust liability among the spokes. And here, even if Guitar Center was exerting pressure on them, plaintiffs allege through their plus factors, particularly that it was against each one's independent economic self-interest, that only coordinated, concerted action on the horizontal level, a rim, if you will, to the hub and spoke conspiracy, would have made this economically feasible. That's the only way really this, in plaintiff's view, makes sense. And certainly defendants have urged a competing inference to be drawn from some of the allegations, such as the ones about Guitar Center. But it's not plaintiff's job at the motion to dismiss stage to exclude all those competing inferences. Or, as other courts have noted, to even have the most plausible of the inferences. We're not living in a competitive world anymore. That's gone. All you've got to do is try to call your phone company and get some information, or call anyone else. You're lucky if they answer the phone. And anyway, Adam Smith, if he were here today, would be very upset. We've taken you far beyond your time. No, no, he likes it. Well, I certainly appreciate your thorough consideration. Thank you. I got a partial degree in economics and in naval science. Margaret Swissler, Your Honors, for the defendants jointly. And I hope I don't need the indulgence of extra time since I'm the appellee, representing the appellee. Ms. Swissler, let me ask you a question that came up in the conversation between Judge Pragerson and counsel for the appellant. And that is, why are the maps of minimum advertising policies in the interest of the manufacturers and not against their self-interest? Well, Your Honor, that goes into the economics of vertical restraints that you identified. If the manufacturers— No, isn't that—so I get it clear in my own mind. Isn't that because if we had a really competitive situation here, each would be thinking of their own self-interest, and they'd want to sell their product, and so they might cut back their prices and try to get more out there. I mean, if you looked at it from Adam Smith's point of view, it would not be in their own self-interest. That's the way I understand it. Well, in oligopoly economics, it is—the Eleventh Circuit said this in Williamson Oil. And Judge Baio said it earlier. This is in the independent interest of manufacturers. There's a vertical question, and then there's a horizontal question. So let me start with the vertical side. On the vertical side, this complaint alleges that Guitar Center coerced or threatened these manufacturers. That's straight out of Monsanto, that it's permissible. Not only permissible, but it's rational. Therefore, in the independent economic self-interest— I guess I didn't make my question clear, Ms. Whistler. I didn't ask for Monsanto. I didn't ask for vertical conspiracies. Your opposing counsel admitted he wasn't alleging that. Tell me why it was in the self-interest of each of your manufacturers to adopt minimum advertising policies. To maintain the goodwill of their shared customer when they did not prefer to continue to sell, to expand the internet. In other words, to bend to the coercive power of Guitar Center. Not if there is no evidence or no allegations that this was anything other than the independent response to the pressure from an independent, strong company. So your answer, rather than being 16 words, would be yes. In other words, the reason that the manufacturers were acting in their self-interest in adopting MAPs, right? Was because Guitar Center was coercing them to do so, correct? Well, independently, that's correct. But that says nothing about the rim to the wheel. But is that why it was in the interest of the manufacturers? Because otherwise they wouldn't sell at Guitar Center, which controls 30% of the market. Isn't that right? That's why you've got to answer this from a vertical standpoint. If it's in their interest to give in to the coercion of their largest customer independently, then why is that creating a rim on the wheel from a horizontal standpoint? Did I ask you about the rim? No. Did I ask you about the wheel? No. I asked you a simple question. Why was it in the self-interest of the manufacturers to adopt minimum advertising policies? You've given me one answer. Because Guitar Center told them to do so if they wanted to sell at Guitar Center. Stop. Is there a second reason? Well, the second reason has to do with this interdependence issue that you mentioned to my opposing counsel. In an oligopoly, it's always in the interdependent interest of the manufacturers in an oligopoly. This is what the 11th Circuit says in Williamson Oil, to raise price and not discount. That's interdependent. You can't draw an inference that there's a horizontal conspiracy in an oligopoly. Is that what we have there? We have an oligopoly? That is what the content of the plaintiff's allegations are, that these manufacturers control a dominant share of the fretted musical instrument market. So if it's an oligopoly, then what the 11th Circuit says in Williamson Oil is interdependent conduct. Everybody wanting to keep their prices up doesn't permit an inference of a conspiracy. So that's why it is in the independent interest of the manufacturers to adopt maps. But going back to first principles here, there's no parallel conduct alleged here. You don't even get into this discussion unless you find— Is it your position that you do not have parallel conduct here? Yes. Then why did everybody act in the same way? They must have had an agreement among themselves. What the allegation is—what is parallel conduct? It's simultaneous price leadership, followership in a short period of time. This complaint does not allege that. But it does. It says that they adopted minimum advertising policies within a short time of each other. Yes, but look at the allegations. Paragraph 96, beginning in 2004 and continuing through 2007, Fender, guitar center's largest customer, modified and strengthened its map policy. Paragraph 97, on information and belief, Yamaha, Gibson, Cayman, Cabe, and Ibanez also implemented, modified, or expanded the maps beginning in or about 2004 and continuing through 2007 took three years to have parallel conduct. That's not parallel conduct. Okay, now substantial similarity of the map policies. Before you even get to the plus factors, you've got to find out if you've got an allegation here that looks as if the manufacturers did the same thing. No timing that's similar, that's alleged here, even after the discovery they had. Now what about substantial similarity? They've got the Fender policy laid out here. So you say if the complaint is laid out saying the five manufacturers shortly after a NAM conference at which mandatory advertising policies were discussed and favorably reported and supported and encouraged on the 1st of September of 2005 all had adopted mandatory advertising policies, there'd be something there, but they didn't do so and they did it over three years, so therefore it isn't even parallel conduct. That's correct, although I would say with respect to the first part of your question, Reed-Albert-Polk v. F. Schumacher, in that case, that's a Third Circuit Affirmative Summary Judgment in a case just like this one, alleged horizontal conspiracy among well-covering manufacturers to eliminate mail-order discounting. This is 1996 or so before the Internet. That case went to trial ultimately on a group boycott, but the horizontal conspiracy summary judgment was affirmed. Trade association meetings at which the problem of mail-order dealers eroding the price margins of full-price retailers was discussed, subsequent adoption of policies to that effect, affirmance of summary judgment. The rationale was if it is in the interest of the manufacturers to give in to full-price retailers, the court said, and this is a quote, that the idea that they gave up profits to a discount outlet does not suffice to establish evidence contrary to their self-interest. That's the holding of the horizontal conspiracy case in Albert-Polk. So I wouldn't agree even with the first part of your hypothetical, that if that's what they had alleged, that it would state an agreement among the manufacturers to be responsive to something they heard or discussed at a trade association meeting. But you don't even need to get there because that is not what this complaint alleges. It does not allege a timing, a coincidence of timing. Think of the cases where that was found. Text messaging. Text messaging. An immediate, within a few days, change in heterogeneous and complex pricing structure. Text messaging. Flat glass, 12 days. Citric acid. Cargill followed within a month of everybody else. That's this circuit's decision. That wasn't sufficient. Within a month. Here we've got basically what happened in this complaint. Some of this is counterfactual, but what happened in this complaint is people started talking about maps in the early 2000s. That's what the complaint says. In 2004, Fender adopted this policy and over the next three years strengthened it, and so did everybody else. What's going on in this complaint is people are acting on knowledge that they got. That's the conscious part of conscious parallelism. So you don't even have to get to some esoteric discussion of what's in their self-interest or not. Yeah, but isn't that all subject to a trial? Find a jury, find a fact. I mean, you're sort of trying the whole case right here. You know, I mean. The question is, should they be able to go forward by quoting that there were, let's go through the plus factor about NAM meetings. Okay, so there's meetings of NAMs. These are trade shows, not meetings. They're trade shows. There's hundreds of people there. The district court found that. And there are panel discussions where people discuss maps. And then over the course of the three years, interspersed with meetings, where the press is present. But we haven't had such findings here because we haven't had a trial. But you have to give, if all you could do is say, I think there's something happened here because I observe in the marketplace there's maps, then Twombly means nothing. Citric acid means nothing. Kendall means nothing. You've got to go after it of an analysis. Like, I thought the conversation that you were having was right out of Kendall. Kendall says, allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to state a violation of the antitrust laws. This judge looked at the allegations in the first complaint, said they were not enough, gave them discovery, which we objected to, believe me, gave them discovery, and then said they still hadn't pled enough. He said, the plaintiff's ambiguous and overly generalized allegations leave open the distinct possibility that defendant's behavior was entirely normal and legitimate. He applied Kendall. So rather than just saying, I think maps were adopted and we should give these guys a chance to go forward, we need to apply the form of analysis that Kendall requires. Did the judge consider all of the factors together or just separately? It has to be, the plus factors are not some kind of magic spell that if you have them, you're in. Check the box and you're in. What they're supposed to do is permit, and this is what Twombly says, permit the parallel conduct to arise in the context that suggests a preceding agreement. So the existence of plus factors alone isn't what it is. It's, do they suggest that there was a preceding agreement? So they have to get through all of them. Now, they've listed a number of them and you discussed them with opposing counsel, but this motive is, as Judge Baez said, all people want to make more money. That's not a common motive. If you look a little closer at what they're saying, they're saying the manufacturers and Guitar Center didn't like big box stores and Internet sellers. That's a common motive for acting similarly. But they, under Twombly, they have, that could be a rational, independent response to a similar market condition, which is big box stores come up, manufacturers don't like them, Guitar Center doesn't like them. Plaintiffs has to come up with allegations that show that what these variously situated parties did is not independent, but not an independent response to that market stimuli, but is different. But I think what Judge Preggison is asking you is, and put it another way if you don't mind, is look, there are two versions of what you can deduce from the actions of the parties. One is that they were acting independently and responding to the interdependent oligopoly in which they were working, and the other was that they were conspiring, right? All right, there are two versions of this. Why not let it go to trial and let the jury determine? Because Twombly says that if those things are equal, and Kendall says if those things are equal, that's not enough. But how can we judge the inherent credibility and probability of independent action versus conspiracy? I mean, on these allegations. On these allegations, the conspiracy comes out much more strongly than any independent action. First, you have to start with whether you've got parallel conduct. You've jumped over that first thing, right? You're assuming that the allegations, even though they're a three-year period, and even though they don't have anything other than a conclusory statement, that the other people's policies were similar to Fender's. That's all they have. And they had the two policies from Yamaha and Kamin. They got those, and they talked about them in some of our conferences, and they didn't plead them. I think you can draw a negative inference from that that they're not similar. They haven't alleged similar conduct other than to use the word, and they haven't alleged instantaneous parallel conduct because they've got this three-year problem. So if you want to jump that and then get into whether or not we need to even look at these plus factors, then it can't be what Kendall says. It can't be just as easily rational legal business behavior by the defendants as illegal conspiracy. There's got to be something that the plaintiffs, and this is the plaintiff's obligation. There's got to be something that says this isn't independent. So, Ms. Whistler, to answer, as I understand your argument, your answer to Judge Baio's initial question about why it was not in the adverse interest of the manufacturers, it is just as likely that when Guitar Center, with 30% of the retail market, came to the manufacturers and said, either you agree to these provisions of the maps or we're going to stop doing business with you, a rational manufacturer could have looked at that demand and said, I don't want to take the risk of what I might be able to sell through the big box stores or on the Internet and lose whatever my sales volume is to Guitar Center. Yes. And that it took a three-year period before all the manufacturers agreed to the demands of Guitar Center. Yes. That's what was held in Schumacher, that quote I read to you, that if they decided they wanted to give in to the full-price retailer and forego the short-term profits they get from discounting, that's not contrary to their interest. Another case that held that, Garment District v. Belk and the Fourth Circuit. There, the manufacturer had a major department store in North Carolina, Belk's stores, and Belk wanted the manufacturer to turn – or Janssen – Belk's store was a discounter, I'm sorry. The manufacturer was Janssen. The manufacturer terminated the discounter at the behest of the full-price retailer, and the Fourth Circuit said it's not in the adverse interest of the manufacturer to decide that they'd rather keep the business of a large retailer than deal with a discounter. So you have two cases in two other circuits that have held that if every manufacturer made that decision from the messaging from Guitar Center, that is not against their self-interest as a matter of law in those circuits in any event. So if you roll that into here, if it's independently, in the independent interest of each manufacturer to give in to Guitar Center, and that's why I was trying to get to that point with Judge Beyer earlier, how can that be the rim on the wheel? How can it all of a sudden be against their interest so that they're in conspiracy with each other when they all react in their own self-interest by giving in to Guitar Center and saying they don't want to deal with discounts? So those are the allegations of the complaint. We've taken you way beyond your time. Judge Briggs, did you have any further questions of Judge Tolman? Well, it just seems to me that this has to show plausible grounds and a plausible suggestion. And I don't really see that as certainly more probable than not is not required. So you just have to have some evidence to show that there's something there, right? In this case, they have to have an allegation that is more likely to be conspiratorial, according to Kendall, than rational legal business behavior. Here they don't have that. So they should amend their complaint? Well, they've already had a couple of amendments, and they also have Rule 11 obligations. So the judge entered judgment for us after the second complaint, after discovery, and we're asking you to affirm it because it's a faithful application of Kendall. Faithful application of Kendall. Thank you very much. You know, courts don't like these cases because they get messy and difficult and all the rest of it. So I have to think of what's in the public interest. Thank you, Your Honor. Do you want to give us some time for a vote? Yeah. I appreciate you hearing me out again. I know we've taken up a lot of time. Well, we're trying to get educated. And we're trying to get to the right answer. Which I certainly appreciate. I'll try and be brief and address a couple of important issues I think you all discussed beforehand. Just tell us, talk about plausibility and what's there that takes you there, huh? What's in this case, which we now know that takes you to that, meets the plausibility test. Certainly, this goes back to sort of the six plus factors we identified before. One of which we spoke about before particularly was the pricing conduct. The prices went down and then at the start of the alleged conspiracy went back up. So over a three-year period, right? Well, plaintiffs alleged that during that three-year period, that's when maps were being revised and implemented. But the point of plaintiff's allegations is that during that time period, everyone was on the same page and everyone was agreeing to essentially revise their maps. Okay, but what evidence do you have to counter Ms. Whistler's observation that unlike the other cases where we have overturned summary judgment rulings because the price increases followed immediately on the heels of the alleged conspiratorial meeting, what evidence do you have to support any allegations that the price increases were immediately effective? There's two responses. The first is that plaintiffs alleged that the maps were substantially similar and adopted in a substantially short period of time frame. And those are, although they don't have the detail that the allegations had in the text messaging case. Why didn't you include that in the complaint? You've got a couple of them and you keep saying that they're similar, but there's nothing in the record that we can look at to reach that conclusion. Well, neither of the other map policies are in the record from either side, and so I'm speaking from memory of those. My understanding generally from those is that we didn't have a full record of the map policies. The map policies we had that were available weren't necessarily for the same time period, so there wasn't necessarily an opportunity to compare the exact wording of those word for word on the exact same date. Well, that gets back to my question about the timing of the price increases then. Are you conceding that they covered different periods, so there's a big gap between when Yamaha raised its or agreed to put a lid on the prices versus when Fender did? We wouldn't concede that that's the case, that there's a large difference between those, but Your Honor's correct. We don't have the same type of specificity on those allegations that was in text messaging. But what I would stress to Your Honor and the other judges is that just because we don't have a particular type of allegation that might have been found in another case doesn't mean that our other allegations— But counsel, just a second. Let me see if I understand you. You say you don't have the minimum advertising policies of the five manufacturers? That's correct, not the written versions. You had the opportunity to conduct discovery for documents and derogatories and depositions, correct? Correct, but may I address that for a moment because I think this will be important to your next question. Well, leaving that to one side, whether you asked the right questions or not, we're talking about minimum advertised prices, advertised prices. The whole purpose of advertising is to put out knowledge as to the prices. Why weren't you able to tell us when the individual manufacturers started advertising their prices? Well, with respect to minimum advertised prices, the allegation in the complaint isn't that every manufacturer was charging the exact same price. No, but they started advertising their prices, right? They said, we will not sell it less than this. Well, they've always advertised the prices. The minimum advertising policies that are at issue here are non-public. They're between the manufacturers and their retailers, and they restrain the ability of the retailers to then advertise the prices that are particular. So you couldn't tell whether an advertised price was based on a minimal advertising policy or not? If you just opened a random pricing blue book guide for any market, I couldn't point to it and say that's a map price. But I'd like to touch on discovery very briefly. And again, I'll be brief because I think you raised an important point that opposing counsel also raised. The discovery here was incredibly limited. It allowed us discovery into purely, quote, private meetings, which the district court interpreted as one-on-one meetings between manufacturers and defendants at NAM trade shows. So we weren't allowed discovery into the map policies themselves. We actually asked and were denied. But that limited discovery order is sort of indicative of a larger issue in this case, which is that plaintiffs simply aren't required to plead that type of direct evidence of an agreement. And that's what the district court focused on throughout this case. And that's really where a lot of the error came. Now, I'd like to touch on two brief points also. First is Kendall. I would urge you all, as we did in the reply papers, to look at the complaint in Kendall and compare it to our complaint. We wouldn't certainly argue that Kendall was wrongly decided. The complaint there contained almost no substantive allegations. Was that a Ninth Circuit case? Yes, it was, from 2008. Are you arguing to a three-judge panel it was wrongly decided? No, I'm sorry if I misspoke. We are not arguing it was wrongly decided. It was correctly decided. I'm sure you know who the author of the Kendall decision was. I didn't think you had omissed that. No, no, it is certainly not. No, it was correctly decided. Well, who was the author? Let's get it out. In Kendall, the complaint there, as you well know, was very conclusory. The allegations were against all banks and financial institutions throughout the United States. And if you compare that complaint on both a qualitative and quantitative level to ours, you'll see that there's significantly more detail, more factual allegations than ours, versus the complaint in Kendall, which is also true of the complaint in Twombly. So that disposes of that issue. The other issue that I mentioned I would like to touch on during my brief time here is that opposing counsel said at the end of her time that what plaintiffs need to do is show that their inferences are more likely than the inferences plaintiffs ask you to draw to the facts. That's simply not the law. It's actually contrary to what the Blackwater law is in this area. For example, I'd like to read you a decision from the Second Circuit, Anderson News, in 2012. The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12b-6 motion. A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events, merely because the court finds a different version more plausible. So here, to the extent that defendants have argued that it's more plausible or more rational for the defendants to follow Guitar Center, we wouldn't know, but that is certainly an entitlement, an inference that they're allowed to say that they're drawing. But it is not an inference that we have to affirmatively disprove. What we have to do is present allegations that plausibly suggest a conspiracy, and we believe our allegations have done that. Thank you for your questions, and thank you for your time here. Thank you. Thank you. Anything else? All right. That will conclude the calendar for this morning, and we'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Tallman, Bea